May it please the Court, Krista Hart on behalf of Ronald, I'm sorry, Donald Bann. Ms. Landau is also here on behalf of Ronald Groves. I will be arguing first. I will be arguing the sentencing issues, and then we'll move on if the Court has questions for the other issues. For how long are you planning to argue? It depends on what the – if the Court has questions on the other issues or not. I actually checked your colleague. As to the sentencing issues, the first I would like to discuss is role in the offense. We raised that, saying there wasn't sufficient evidence in the record to justify the role in offense two-level enhancement. The government has conceded that issue, and so based on the government's concession, I presume the issue is over, unless the judges have – you have any questions. If not, I will move on to the abuse of discretion. And I believe that the district court erred in imposing the abuse of discretion. I think you're referring to abuse of trust, don't you? Yes, I'm sorry. Abuse of trust. Two-level upward adjustment in this case, because there is nothing particularly unusual about this case that takes it out of the realm of a generic fraud. There was an inducement, a misrepresentation, which is what induced these individuals to give their money to Mr. Groves and Mr. Mann as his partner. Counsel, how does this case differ from Loriente? Well, Loriente were actual – that was a large brokerage firm that had certified, licensed, vetted agents and brokers within their brokerage firm. So this was an agency, a firm that put themselves out there that said, we are – have been registered with the SEC. We have complied with all the terms and conditions and satisfied these regulations. We've been vetted. And we are legitimate investment brokers. Well, in a way, didn't your clients hold themselves out to be people who were well-versed in financial matters such that they could be dependent on to give good advice regarding rates of return and the money that would be made if these victims invested with them? I agree with – I agree that they – that Mr. Groves made those representations and Mr. Mann as his partner was there as well. The difference here, though, is that is the essence of a fraud, is someone holds themselves out to say, look, I know what I'm doing. I can make you some money. If you give me some money, I'll double it, I'll triple it, 10 to 1, 40 to 1 returns. That's the essence of the fraud. In order to impose the abuse of trust two-level upward adjustment, there has to be something more than that. And the – The essence of the fraud is actually a misrepresentation. And then, in addition, in Loriente, we said that abuse of position of trust is applicable if, because of special knowledge, expertise, or managerial authority, the defendant is trusted to exercise substantial discretionary judgment that is ordinarily given considerable deference. Why isn't that definition met here? My view of that language there applies when an individual is investing their money with a firm generally. When they're saying, take my money and you exercise your discretion over, you know, in a mutual fund, what – I think the real way this is different, I don't know if it's because of the licensing or anything like that, but they were selling one – well, they weren't just selling one product. I guess they were – because there were a couple of different things that there were. It was essentially the one product, the bank trades, and then there was some discussion about Aquacel, a separate entity, but my understanding is that a majority of them just dealt with these, quote, unquote, bank trades. Ginsburg. Which was kind of represented to be a financial instrument, much like, you know, you would do with stocks and bonds and mutual funds. Kagan. I agree. And in that instance, you need to be registered with the SEC. You need to be a legitimate broker to engage in these transactions, which is not what we have here. This is, you know, a guy who knows a guy who knows a guy who can make you some money. I mean, that's not – this isn't a – Mr. Mann and Mr. Groves didn't hold themselves out to be a general brokerage firm where individuals could come for a variety of different products. This was basically word of mouth is how people learned about this. Ginsburg. But people would not have invested unless they were convinced that there was a level of expertise that they could rely upon to make money from. Now, that's the difficulty I'm having with your trying to make a distinction. Kagan. I understand that. But the difference would be – I mean, people wouldn't invest at all if they didn't have some belief in the defendants. And so they had to have – Kagan. The abuse of trust enhancement is not limited to finances. Kagan. No, it's not. I mean, there has to be a line somewhere, because if you go in and buy a car, you're relying on the expertise of the car salesman. But I presume nobody would say that it was abuse of trust. That's correct. I would agree with that. And same thing with, you know, you have doctors. If you have – if a patient goes in to see a doctor who's got board certifications on the wall, has graduated from college, medical school, then you have some trust in that doctor because of the position that they hold. But if you go – But nothing – I mean, nothing in Lorienti suggests that these brokers were licensed and didn't matter. Well, they do discuss the fact that they were licensed. I cited that in my brief. But the language that I read to you didn't say anything about the fact that because they were licensed, the abuse of trust enhancement was appropriate. I got the sense that we were saying that if you hold yourself out to have special expertise in a particular area, and people are victimized because of reliance on that professed expertise, then the abuse of trust enhancement applies. And the problem I have with that analysis is then what kind of fraud does not include abuse of trust? Because every type of fraud, you are inducing someone into parting with their money or property based on a statement, a misrepresentation you have made. That is the essence of fraud. The question is, what is different that makes it an abuse of trust, that someone has a – holds a, quote, unquote, position of trust? Sotomayor in Lorientia, it says anything about the licensing? I can't find it. Well, it says, in my brief, I wrote, Hampton Porter was registered with the Securities and Exchange Commission. That's at page 534 in Lorientia. That's just a fact. And appeared to have at least two – have at least some registered and licensed brokers on staff. And so we know that Lorienti did – was registered with the SEC and did have licensed brokers on staff. And the issue in Lorienti had to do with whether the abuse of trust was incorporated, was an element of the fraud. And so Lorienti isn't really even precedent in this case. It was the first Lorienti, but then there was a second one. There was a second one. Here is the difference. The court said that, you know, we said it would be different if a client were hiring Lorienti to make trades at their direction. So if somebody said, I want to buy Apple and I want to buy a stock in Southwest or whatever, and I want you to make that happen, that's different than saying, what stock should I invest in? What do you – I trust your judgment to tell me what to do? So I see a difference between somebody who is sophisticated and is directing a stockbroker to make trades and somebody else who is relying upon the stockbroker's expertise. And I see this case, Groves, as being in the category where someone is relying upon this expertise to tell them where to invest their money, as opposed to telling him which activities to invest the money in. And my view is a little different in that these folks came to Mr. Groves and Mr. Mann because they had heard from a friend that they wanted to buy this. There was no – They didn't go to them and say, what should we buy? I'm sorry? They didn't go and say, you're an expert in finances, what should we buy? Exactly. That's exactly it. And so that's my point there. They had already put the word out. This is a great opportunity. That's how the word of mouth spread. They spread the idea that we have this unique opportunity for investment with these bank trades that very few people know about. It'll give you a high return. So even though the people didn't come to them and ask them what to invest in, they put the word out in the community that these were some highly lucrative, sought-after investment opportunities that people should take advantage of. I agree with that. But then I would like to analogize that to the medical profession, which I talked about earlier, is if you go to a doctor and that doctor has, you know, degrees and certifications on their wall, you have some trust in that. Versus if you go to somebody on the street and that person is saying, I have got this elixir for you, it is going to cure all your ills, it will, you know, cure your baldness, you won't age, and they are actively out there going from carnival to carnival or wherever, making these representations. They are actively out there seeking, as in your analysis, as Mr. Gross and Mr. Mann were. But that doesn't mean that this person who is not a doctor knows anything about what he's saying. I mean, he might say, trust me, I know what I'm doing. But that doesn't create a level of trust. It could. It could, to a vulnerable person who is desperate, who has tried everything else. You know, we hear stories all the time of people who have incurable diseases, and they go to people who have told them, you know, nobody else can cure you, but I can. That can induce trust. If somebody is vulnerable and at a position where they, you know, put their trust in people. That's not what we have here, though, actually. But neither Mr. Gross nor Mr. Mann held themselves out as a licensed, quote, unquote, legitimate medical professional. That's what the investment broker, what the notes in the guideline call for. Okay. So is there anything else that you're going to do? At this point, I'm willing to submit, unless you have some questions on the sufficiency of the evidence, or if you have questions for Ms. Landau on the prosecutorial misconduct issue. Okay. Okay. I'd like to hear about the prosecutorial misconduct issue. In that case, we'll address it. May it please the Court, I'm Karen Landau, and I represent Mr. Gross. And excuse me, I'm also getting over a bug, so I'll look. If I fade out, just tell me. I thought you represent Mr. Mann. No, I represent Mr. Gross. She represents Mr. Mann. You represent Mr. Mann. Yeah. Yeah. So, yeah, this was a, you know, Mr. Gross had a little bit of an unusual defense. He argued that he was a dupe, and he testified. And as it's laid out in the brief, during cross-examination, the prosecutor commented on his, essentially commented, invited him to comment on the credibility of other witnesses. Well, did he? So let's look at the actual language, because I think it was close, but I'm not sure it went across the line in terms of asking. In your mind, if the prosecutor asks someone whether or not the testimony of another witness is true, would you comment on the credibility of the witness? Yes, it is, Your Honor. I think that, you know, I can see that there is a distinction, but I think it's ultimately a distinction without a difference. And I acknowledge the Greer case, and frankly, not mentioning it in my brief. That was – I made a mistake, and I apologize. So tell me, in your view, which of the cases from this circuit come closest to saying that if a witness is asked whether or not another witness's testimony is accurate, that calls for a comment on the credibility of the witness? I would say it's the one cited in the brief, Guestin, Wetherspoon, Holmes, and Sanchez. I wrote Guestin. That's why I asked you that question. And Sanchez. Well, yes. Is there a difference between calling somebody a liar? Well, first of all, for the most part, he didn't even say, was that correct? He basically said, is that what they testified to? That's right. You're right. As to – there was one instance in which he said, was that incorrect? And he said that would not be the truth. But that's – people can say something that isn't the truth and not be, quote, liars, right? They can say something incorrect because they can be mistaken. That's different than saying they're a liar. That's true. And certainly, you know – but I think, you know, I was thinking about this this afternoon, and, you know, what came to me is that ultimately what he's doing, what the prosecutor did in the examination, is he made an argument. And he made an argument that Mr. Groves was a liar. But that's different. And he did it, but he did it by – and, yes, it is – he didn't call him a liar, and he didn't come out and say, well, you know, are you saying these people are a liar in those words? But that's what he effectively did. And to me, that – that line of – that action, yes, it's a step past – past or within, yes, it's a step past. Kagan. I'm going to interrupt you for a minute just because I'm confused about something. I thought it was Mr. Mann who was arguing that there wasn't substantial evidence and he was the dupe, and that Mr. Groves had no such argument. No. Well, I did not make a substantial evidence claim on appeal. Right. But Mr. Groves' defense at trial was that he was a dupe. So they were both dupes? They were both dupes, yes. Of each other? All right. You know we take these cases. But, no, Mr. Groves, if you read the closing argument, and I included his testimony, well, Mr. Groves, you know, actually, that's – that's perhaps not – not a correct – maybe that's an oversimplification. I just want to make sure that I had the situation. Yes. No. In closing argument, Mr. Groves' trial counsel did argue that he was a dupe, that he just wasn't – you know, that he – that this was – he believed – he really – he drank the Kool-Aid, basically. He believed in the product. He believed in the product. He did. He did. And, you know, in cross-examination, you know, Mr. – I mean, in direct and cross-examination, Mr. Groves' testimony was that he really didn't intend to defraud anyone, and he really did believe. He genuinely believed in it. It's a deflection just because I was confused. Go ahead. Okay. But I just – going back to the prosecutorial misconduct claim, so would you agree that – would it be fair to say that in order for us to accept your argument regarding prosecutorial misconduct, we'd have to extend the rationale of Gaston and those similar cases? Yes, that would be fair, Your Honor. It would be. And also, I mean, this doesn't seem like a very promising case to either be worrying about this, because it only goes to one of the statements. Do you agree with that? I'm sorry. That this concern only goes to one of the statements at most. No, Your Honor. I don't agree with that. I think – Well, and then the rest of them, all he said was, did you hear Mr. So-and-so say such and such. Right? So I don't see how that's saying anything about – he was simply trying – I think he went a bit further than that, actually, Your Honor. And I – let me point – let me – Mr. Kerry. So Mr. Kerry got it wrong. Mr. Kerry got it wrong. There's that one. And then there was a similar statement for Agent Snodgrass. That's right. That's right. And then there was, here, Mr. Lee, because Lee had testified that Groves told him he couldn't give him a refund because his money was tied up in a trade, and the he didn't think he would say that. So he – you know, that's essentially – again, it is a step removed from – he didn't ask him if Mr. Lee was lying or if Mr. Lee was telling the truth, but what he said amounted to a comment because he's – I didn't think I could say that. And frankly, the only reason – the question certainly invited that type of a response. Mr. Groves did not say that anybody was lying. You know, I mean, another defendant would have – that question, did you hear this testimony, I don't – and the defendant says, I don't think I would have said that, another defendant easily could have said, no, he's lying. And that would have – I mean, the question still asks for a comment on credibility. The fact that they didn't get the answer on credibility is simply a matter of luck. Well, the prosecutorial misconduct in Gaston was that the prosecutor explicitly and directly asked whether or not the other witness was lying. Yeah, that's true. And as I said, I concede it is a step beyond. Okay. If there's no further questions, I'll reserve the rest of our time for rebuttal.  Thank you very much. Good morning. May it please the Court. My name is Jared Dolan. I'm an assistant United States attorney in Sacramento, appearing on behalf of the United States, asking this Court to affirm the convictions of both Mann and Groves and remand for resentencing as to Mann for the issue that we conceded error on. Were you trial counsel in his case? I was not, Your Honor. Trial counsel is no longer with the office. He retired from Federal Government service. I think this Court kind of hit the nail on the head. I mean, Greer forecloses the entire question. It's dispositive on every point that matters. But I think it's important. Well, not as to the Budinger question. I mean, that question was, so was he telling the truth? That question is erroneous under Greer, isn't it? Yes, but in Greer as well, Your Honor, there was one improper question that was conceded, and it was held not to have affected it. So that's why I said it's dispositive on every question. But I think it's important to remember under Gaston and some of the other cases in this circuit, the error complained about isn't asking, or the error, the prosecutorial misconduct in these types of questions isn't asking hard questions, and it's not confronting the defendant with uncomfortable evidence. It's asking the defendant or the witness in the case of Gaston, because I guess that was a case where it was other individuals that hadn't even observed the trial. But the error is asking the defendant or the witness to comment on the credibility of another witness, asking the witness to say, was he lying when he testified in this court? That's something that, first of all, the witness doesn't have the ability to know because it's speculation. He's not in the witness's mind. And second, it's improper. That's the jury's decision. It's not the jury's decision is to determine credibility, not the defendant. But where I think most of the questions, whether it's Greer or some of the other circuits, say that this conduct is okay is as long as you're not asking the defendant to do that, as long as you're asking and confronting the defendant with the trial evidence that he alone was able to observe all of it, it is proper. Because when the defendant takes the stand, you know, I do agree, I think, with something that counsel just argued. The government's job is to try to discredit the defendant in a proper way. It's to test his testimony through the crucible of cross-examination. So is it your viewpoint that the prosecutor should come as close to a violation as possible without actually going over the line? Is that what you're saying? No, Your Honor. But I think it is important for the prosecutor to confront the defendant with the truth and not act like the trial hadn't just happened. But what's odd about this is that what was the point of all these questions? If you – essentially, it was making a closing argument, right? I mean, he was standing there and he wasn't really asking the defendant anything, for the most part. He was, for the most part, saying, did you hear so-and-so say such-and-such? And then a couple times he said, well, is that not true? But it was either very close to the line or pointless, except to continue to raise the same evidence in the jury's mind over and over again. Your Honor, I think looking back at the entire cross-examination, the point was to get Mr. Groves to admit that he had made representations to investors, because he was kind of being evasive on that. He wasn't exactly denying it, but he was coming pretty close. I wouldn't have said that. I didn't say that. I don't think it came out that way. And the prosecutor, I think, was trying to refer to the trial evidence that Mr. Groves had observed and say, no, that's exactly what happened. You heard the testimony of this person and this person, right? And then to confront Mr. Groves with really the most crucial evidence of the crime, which was the bank records, to say that there wasn't a secret pot of money that had everybody's funds saved up to invest in these fictitious bank trades. In fact, they spent it on whenever they wanted. And they weren't dupes. They weren't saving it up for someone to just rescue them with a 40-to-1 return on the money that they had saved. As seen from the government's exhibit, which is reprinted in the brief, they never got close to $1.8 million, despite collecting more than $4 million. I don't think the government's job is to come as close to the line as possible without stepping over. But I don't think that's what happened here. I think the prosecutor confronted Mr. Groves with the evidence. And except for the one occasion that the government conceded on, it was not misconduct. Ginsburg. Could you address the abuse of trust enhancement? Yes, Your Honor. I — in every way that meant — first of all, the review is for plain error because that wasn't raised in the sentencing court below. But — How is this different than somebody walking into a car dealer and saying, you know, I hear you have good cars. My friend told me that. And tell me about this car. And, you know, I know you know a lot about cars. So I'm thinking of buying this car. And does this car do this? Does this car do that? How is it different? Or walking into, you know, Best Buy and asking about a computer. Well — Well, you guys must know a lot about computers. You sell them. I used to sell cars, Your Honor. I don't know that there's a lot of trust that happens between the two. I mean, I wish it was — But that means you're somehow making finances different. I mean, in other words, what's the difference between, you know, I hear you're selling some good bank trades or I hear you're selling good cars? Well, the person is not holding — The key sentence, it seems to me, in Laurenti is that they were relying on his discretion. And in this instance, they weren't going in and saying, what should I invest in? They're going in and saying, I hear you're selling some good bank trades and I'd like to buy them. Well, I respectfully disagree. I mean, there were a number of programs available. They were all kind of selling the same thing, but it was the four-to-one, the 40-to-one, the AquaCell. I mean, they were all kind of nonsensical. Well, they didn't actually sell the AquaCell. I thought they just took the money and put it in the AquaCell when they weren't getting anywhere with the bank trades. Your Honor, later in time, after AquaCell went out of business and they said don't solicit any more investments for AquaCell, then they sold AquaCell. But before then, they hadn't. And I think that's in the brief as far as — The key sentence, it seems to me, in Laurenti is the kind of relationship we said was requiring contrariness. One characterized by substantial discretionary judgment. That is ordinarily given considerable deference. So it's not just expertise. It's discretionary judgment. And I would submit, Your Honor, that in every way that matters, Mr. Mann and Mr. Groves held themselves out as investment advisors. They had an office. They had secretaries that called and answered the phone for them. They solicited investments. They had weekly conference calls updating people, updating their investors. But were they advising them about what to invest in as opposed to selling a particular investment? Your Honor, I don't think it was like a — I don't think it was like a brokerage firm, if that's the question. But I don't think that's what's required. But that seems to me to be — I mean, because there has to be a line somewhere. Otherwise, I don't see the difference. Well, I agree. But it's a car example. I mean, I understand people don't trust cars, most people. But most people don't trust people who sell — who tell you you're going to make a 40-to-1 profit either. I mean, these were just kind of stupid people. And those same stupid people could walk in and trust the car dealers. That's why car dealers are a bad rep, because people believe them sometimes. So — And, Your Honor, what I would say to that is I would look at Lawrence, but I would also look at Contreras, because the law in the circuit used to be that you looked at the person's role in the company, and that was kind of controlling. But that's not the law anymore. And now you look at whether the person had a position of private trust. And I think vis-a-vis the investors under the circumstances of this case, given all the trappings that were being portrayed, Mr. Mann and Mr. Groves held a position of private trust with the investors. And that position of private trust allowed them to get away with it. There weren't other individuals that were involved in the management of the bank accounts. And here's another area that I think is important, because on the role enhancement, you know, that doesn't apply under this Court's guidance in Whitney and some of these other cases, because there wasn't anyone else that was criminally culpable. But where I think that matters is Mr. Groves and Mr. Mann were at the head of an organization, and others were involved in this organization, whether it was Cricket Beck, who testified, Jerry Lee, who did tech support. There were other people involved in this organization. And it was Mr. Mann and Mr. Groves that had the managerial discretion over the money. Without — But isn't the emphasis in the abuse of trust enhancement on the relationship to the customer, not the relationship inside the organization? Well, it's a two-part. The first is the private trust, and then it's the managerial discretion. Okay. But the first part. Right. So I think with the private trust, I think it's the relationship that Mr. Mann and Mr. Groves had with the investors and what they portrayed to the public at large. And I think under the circumstances of this case — But which was not come to us and we'll help you decide which investments to make, right? No, but I don't think that's required. I mean — But I just read the sentence. Why isn't that — isn't that a holding of Lorienti? What was the discretion? The discretion was putting the money in either these bank trades or Aquacel and doing what they said they would, making the right bank trade at the right time, setting aside the $1.8 million. I mean, none of it existed. So it's kind of — I mean, it's almost farcical to argue that they were exercising discretion because what they were really doing was spending it as they pleased. But I think on plain error review at this point, it's sufficient for the abuse of trust enhancement. Isn't that a good point? Isn't that a warrant plain error review? Isn't it de novo review on the application of the guidelines? Your Honor, not when the error is not preserved. Right. Suppose it were in plain error review. Your Honor, I think it would be — I think on this record, if it was not plain error review, it would be a closer question. But I think there would be a better record because what the government would have done at sentencing is basically pulled from the entire trial that everybody had observed, all the witnesses, all the evidence, the pictures, the investor files, everything, and said, when you look at all of these factors, this is exactly the type of conduct that abuse of trust was designed to apply to. Because at that point, you would have testimony regarding how the victims were recruited and what they were told when they were recruited about the expertise of the men who were running the business, which would make a big difference in terms of how you weighed that. Exactly. And I think the other thing that this Court can look to is the recorded conversation between Mr. Groves and the undercover as to the type of representations that were made, that these — you know, that this is how it's done, that nobody else has this experience, that it's super secret and that's why these opportunities aren't available to the public at large. That's the reason for the confidentiality. That's the reason for the contract. I mean, these are all the trappings. But can you, on this basis, I mean, if you go — what fraud case, or at least any major fraud case, any Ponzi scheme or any of the kinds of cases that we see fairly routinely, wouldn't fit here? I mean, ordinary — they all operate in essentially the same way. They essentially tell people that they, you know, know something, they have this great deal, and we know something that other people don't know and come to us, and we're going to make you a whole lot of money. And how's it different? I understand the Court's question. I have two answers to that. The first answer is, I think, you know, mortgage fraud scheme, your typical straw buyer wouldn't apply to that. If you look at just a very typical fraud, not a Ponzi, not an investment fraud scheme, it obviously wouldn't apply to that. And indeed, this is a Chapter 3 enhancement. It's not specific to 2B1.1. So it applies across the guidelines universe to really every crime. It's not just a fraud guideline. But more to Your Honor's point, I think that Ponzi's and investment fraud schemes are uniquely — most of the time, the abuse of trust enhancement will apply to the way those schemes typically work. And it's not double-counting, because 2B1.1 doesn't call on enhancement for that reason. There's no enhancement in 2B1.1 for abuse of position of trust. It applies to larceny. It applies to embezzlement. If somebody's selling gold mines in Africa, because I know a lot about gold mines in Africa, I mean, there are cases, too. Why is that different? You don't know. You know, I'm an expert in gold mines in Africa. Well, I think it's the relationship between the individuals. I think when it's not — when it's — when it's just an arm's-length transaction or just a one — That's what I'm trying to get at. Why isn't this that? Because of the nature of the scheme. Because of holding themselves out as offering investments, holding themselves out as being able to make these bank trades, keeping the money. And tell me why that's different than gold mines in Africa. Because that's just a lie. I mean, that's not — I mean, you know, I mean, that's just — I mean, there's a difference between lying for money and cultivating a relationship with the investors of the fraud that enables individuals to escape detention. That is exactly the type of conduct that — You have really secret gold mines in Africa. I'm really — I'm having a hard time with it. You're talking — it's like the e-mails you get. You've won the lottery in England. Contact me immediately for your prize. I mean, that's just a lie. Right. And so I see the point here. It's a close issue sometimes. Agreed, Your Honor. And my submission is that on plain error of view, it is no longer a close issue. Okay. Thank you, Your Honor. Anything else? No, Your Honor. I don't want to cut you off. You have a little time left. All right. You guys have a minute and a half between you or so. Two minutes, let's say. The idea that an individual trusts another person does not, in and of itself, create a position of trust. That's just someone trusting another person what they said. Can I ask you something? The trial judges see a lot more of these than we do. Why do you think we're in a better position to make this call than the district court judge? Well, unfortunately, this wasn't raised in the district court. And so the district court was not asked to. But the district court imposed the abuse of trust. They didn't. That is true. But the defendant, Mr. Mann's attorney, did not raise this. It did not object to it. I think ultimately your answer has to be because it's a legal question. The question is, where is the legal clause? How would you define, if you wanted to give a, you know, two-sentence guidance as to what is an abuse of trust and what isn't? How would you say? What should we say about that? I would say when a person holds themselves out as a licensed, certified, vetted individual You're going to lose, because there was no reference for licensing in the relevant Laurenti opinion. There wasn't any. So let's leave out the licensing, because you're not going to get anywhere. But let's see. Leaving it out. Then the next thing would be what discretion the defendants had here. And the contracts were very clear. When an individual signed a contract and turned over their money, the money was going into a specific product. Now, neither Mr. Groves nor Mr. Mann had any discretion about what they would do with the money after it was changed. Apparently they did, because then they put the money in something else. But that was the fraud. So you're just saying that putting in an Aquacell was itself a fraud, even if Aquacell were a good investment, because it wasn't what these people bought. Well, actually, yes. Because if the individuals are contracting with the defendants to put the money in their 10-to-1, the 40-to-1 bank trades, then there's no discretion on behalf of Mr. Mann or Mr. Groves to do anything different with the money. That begs the question, though. Does it matter how they cultivated the people who were going to invest? Does it matter if they said that they were experts in this area and they should leave everything to them? Would that matter? I think it does matter. Because you are cultivating within the individual that you have some knowledge above and beyond what is out there, that you are going to be able to manage this better than they could, and that you are going to make this money for them. If the investor has the Mr. Groves or Mr. Mann would have the discretion to do with it as they pleased as far as investing, like in a mutual fund. Okay. Your time is up. We thank all of you for your argument. United States v. Groves and Mann is submitted, and we are in recess for the day. Thank you.
judges: Lynn, Berzon, Rawlinson